L. B. Hartz v. Commissioner.
Hartz v. Commissioner
Docket No. 9344.
United States Tax Court
1947 Tax Ct. Memo LEXIS 229; 6 T.C.M. (CCH) 465; T.C.M. (RIA) 47121; April 28, 1947
*229 Donald B. Smith, Esq., and I. E. Krawetz, Esq., for the petitioner. Edward C. Adams, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency in income tax liability for the year 1941, in the amount of $28,452.90. The issue is whether the Commissioner properly determined that all of the net income of the alleged partnership of L. B. Hartz Stores is taxable to petitioner, L. B. Hartz, for the year 1941. Petitioner, L. B. Hartz, is an individual residing in Thief River Falls, Minnesota. He filed his income tax return for the year 1941, on an accrual basis, with the collector of internal revenue, Minnesota District at St. Paul. Petitioner along with his father, B. J. Hartz, mother, Louise K. Hartz, and a sister, Louise K. Hartz, operated a truck farming business from 1911 to 1917. The father, B. J. Hartz. owned the farm and furnished the capital for the operation of the business. All members of the family had various duties and performed their respective assignments. The profits of this business were distributed between petitioner and his mother and sister. The largest profit divided in any one *230 year was between $1,500 and $1,600. Petitioner served in the Military Service for 19 months, beginning in 1917. After returning from the service he took a 15 months course at a Duluth Business School, beginning in the fall of 1919. Following this business course he worked for six months for a meat packing concern, as a ledger clerk, followed by two and a half years of employment as a bookkeeper for a retail hardware establishment in Duluth. There were some short intervals of unemployment between jobs up until the time of the purchase of a store in 1925. In 1925 petitioner and another bought a general country store located at Roseau, Minnesota. Petitioner's original investment in this business was $2,500, an amount that he had borrowed from a bank in Duluth. At this time, 1925, petitioner's other assets consisted of some $2,500 of unliquidated stock of a business purchased about two months earlier in Duluth as a bankrupt concern, an old automobile and three units of stock in the De Georgio Fruit Co. in California, valued at $480. After operating the store some three weeks as a partnership, petitioner bought out the other party. This transfer was effected by turning over to the other *231 party all the cash that had been taken in during the three weeks the store had operated and some 700 pairs of shoes. Petitioner then had no operating cash for his store. After a discussion with his father, Bernard J. Hartz, and sister, Louise K. Hartz, he borrowed from them $300 and $500, respectively. There were no written agreements as to these loans. However, petitioner agreed to pay 6 per cent interest on the amounts borrowed. Petitioner operated this business as an individual owner from 1925 to 1928 under the name of "Hartz Cash Stores Company." During the year 1928, Louise K. Hartz invested another $500 with the store on the same basis as her previous investment. On January 10, 1928, the business was incorporated under the laws of the State of Minnesota as "L. B. Hartz Cash Stores, Incorporated." The officers and directors of the corporation were, L. B. Hartz, president and treasurer, B. J. Hartz, vice president, and L. K. Hartz, secretary. An application was made to the Securities Commission of the State of Minnesota for authority to sell some of the company to the public, but was denied because of the attempted capitalization of good will. During 1932, the name of the *232 business was changed to "L. B. Hartz Stores, Incorporated." In 1933 the principal office and place of business was changed to Thief River Falls, Minnesota. The business originally was that of operating a line of general mercantile stores. However, the business gradually changed to one that operated both wholesale food distribution and retail establishments. Without interruption in the conduct of the business, the corporation began liquidating April 30, 1937. At this time petitioner owned about 75 per cent of the outstanding stock, petitioner's family owned 12 1/2 per cent, and the remainder was owned by outsiders. The liquidation of the corporation was effected in the following manner: The holders of stock, both common and preferred, other than petitioner, were paid off and the stock canceled. The payments to the other members of petitioner's family were made by crediting their respective investment accounts for the amount of their stock. The business was turned over to petitioner by the corporation on April 30, 1937, in payment of his common stock of the corporation. From the completion of the liquidation of the corporation to January 2, 1941 the business was operated by petitioner *233 as an individual proprietorship under the name of "L. B. Hartz Stores." The income of the business known as L. B. Hartz Stores for the calendar year 1937 was reported for Federal income taxation on the 1937 joint income tax return of petitioner and Harriet L. Hartz, husband and wife. There was no "break down" as to corporate earnings and individual earnings. The income of the business for the year 1938 was also reported for Federal income taxation on the 1938 joint return of petitioner and his wife. The income of the business for the year 1939 was reported on a partnership return of income, Form 1065, which asserted the existence of a partnership in which petitioner and his wife each had a 50 per cent interest. The return was signed by petitioner. It was later determined that the partnership return was filed in error and that there was no such partnership in existence in 1939 in connection with the conduct of the business of L. B. Hartz Stores. The income of the business for the year 1940 was reported for Federal income taxation on the 1940 individual return of petitioner. A document captioned "Articles of Partnership, L. B. Hartz Stores", dated January 2, 1941, (actually *234 agreed to in the fall of 1940 but signed subsequent to the latter date - during the early part or middle of 1941) was executed by L. B. Hartz, (Miss) Louise K. Hartz, Bernard J. Hartz, (Mrs.) Louise K. Hartz and Harriet L. Hartz. This document provided in material part as follows: THIS AGREEMENT, Made this 2nd day of January, 1941, by and between L. B. Hartz, first party, (Miss) LOUISE K. HARTZ, second party, BERNARD J. HARTZ, third part, (Mrs.) LOUISE K. HARTZ, fourth party, and HARRIET L. HARTZ, fifth party, WITNESSETH: That the parties hereto make this partnership agreement on the following terms and conditions, towit: I The partnership shall be conducted and carried on under the partnership name, style and firm of "L. B. HARTZ STORES". II The partnership shall engage in the general wholesale and retail grocery, bakery and other commodity business and may engage in such other and additional business as the partners may from time to time agree upon. III This partnership shall commence on the 2nd day of January, 1941, and shall continue until dissolved by the partners or court. IV The principal office of this partnership shall be located at Thief River Falls, Minnesota, *235 but the partnership may maintain other and additional offices, stores, property and equipment at such other place as shall be determined upon by the partners. V Full, complete, and accurate books of account shall be maintained at all times at the principal offices of the said partnership and each partner shall at all times have free access to any and all of the said books of account of the partnership. Each partner shall promptly enter in the books of account of said partnership all receipts, charges, withdrawals or other financial transactions involving any of the money or other property belonging to the partnership, together with the essential explanatory particulars with reference thereto. VI All profits and losses shall be shared by the partners and ownership of all of the property of the partnership shall be divided as follows: Twenty-five percent (25%) to first party; Twenty-five percent (25%) to second party; Fifteen percent (15%) to third party; Fifteen percent (15%) to fourth party; Twenty percent (20%) to fifth party. The partners have contributed capital to the partnership in the foregoing percentages. Each partner shall be permitted to draw such amounts *236 as may be expended by said partner for the benefit of said partnership which shall be carried as an expense of the partnership. VII The first party shall devote his full time and energy for and in behalf of the business of the partnership. The second, third, fourth and fifth parties shall not be required to devote their full time and energy to the business of the partnership but shall devote such of their time and energy to the partnership as shall be necessary for the proper management and operation of the said partnership. If agreed upon by all the partners, the first party may be paid a salary which shall be in addition to his share in the profits of the partnership. VIII The bank account of this partnership shall, at all times be carried under the name of the partnership, namely, L. B. HARTZ STORES. All checks, notes, or other negotiable papers may be signed by the first party or by any tow of the other partners. * * * IX * * * the partnership will and does assume responsibility for all of the debts and obligations of L. B. Hartz doing business as L. B. Hartz Stores as of the date of this agreement. X Any partner who shall be desirous of selling his interest and *237 share in the business shall be at liberty to do so, and shall in such case first offer such share and interest to the other partners at a price to be named by the selling partner, and if the other partner shall not within sixty (60) days accept such offer, then the selling partner shall be at liberty to sell his share and interest to any other person or persons at the same or higher price, but shall not sell the same to any other person or persons at a less price or on more favorable terms unless and until it shall have been offered to the other partners at such less price or on such more favorable terms and such last mentioned offer shall not have been accepted within the said sixty (60) days. XI If any partner shall die during the partnership, the survivor or survivors shall have a reasonable time not to exceed one year after the date of such death to close up and settle the partnership during which time the survivor or survivors shall have full authority to conduct the business of the partnership and to take such other steps as shall be deemed necessary by them to settle the affairs of the partnership. Nothing herein contained shall necessarily make it incumbent upon the survivors *238 to discontinue or liquidate the business of the partnership so long as the representative of the estate of the deceased partner is paid the full value of the deceased partner's share of the partnership or other mutually satisfactory arrangements are made with the heirs or beneficiaries of the said deceased partner. The partnership interests, above mentioned, were arrived at in the following manner: The 25 per cent interest of (Miss) Louise K. Hartz was derived from two instruments. By one, an assignment dated January 2, 1941, executed by L. B. Hartz, she acquired a 10 per cent interest in the business of L. B. Hartz Stores, recited value of $15,253.03. The other instrument was a bill of sale dated January 2, 1941, of a 15 per cent interest in the same business for and in consideration of $22,879.54, payable $6,500 on the date of the instrument and the balance at the rate of $1,500 per year commencing with July 1, 1942, interest on the unpaid balance at 3 per cent per annum. The $6,500 that was payable at the date of the instrument was already invested in the business. (Miss) Louise K. Hartz had invested the following amounts in the business from earnings of her teaching profession: *239 1925 - $500; 1928 - $500; 1934 - $4,500; 1937 - $1,000. These amounts were to draw 6 per cent interest per annum. At the time of the hearing of this case she had, at dates not shown, paid $9,000 into the business on the unpaid balance of the consideration. This amount also was earned by her in the teaching profession. The 15 per cent interest of B. J. Hartz was derived from two instruments. By one, an assignment, dated January 2, 1941, executed by L. B. Hartz, he acquired a 13 per cent interest in the business of L. B. Hartz Stores, recited value of $19,828.94. The other instrument was a bill of sale, dated January 2, 1941, of a 2 per cent interest in the same business for and in consideration of $3,050.60; $1,300 was acknowledged as paid by the instrument and the balance was to be paid within one year. The $1,300 that was acknowledged as paid by the instrument had been previously invested in the business under the following circumstances: $300 had been invested in 1925 and $1,000 had been invested in 1938. Under the investment arrangement he was to receive 6 per cent per annum on his money. The money had been earned by B. J. Hartz through his carpenter work. Subsequent to the date *240 of the instrument he made payments of $1,300 pursuant to the bill of sale, in the following manner: He put $300 in the business during 1941 and $1,000 in 1942 out of money earned from his carpenter work. The 15 per cent interest of (Mrs.) Louise K. Hartz was derived from two instruments. By one, an assignment, dated January 2, 1941, executed by L. B. Hartz, she acquired a 14.025 per cent interest in the business of L. B. Hartz Stores, recited value of $21,735.57. The other instrument was a bill of sale, dated January 2, 1941, of a.075 per cent interest in the same business for and in consideration of $1,143.47; $1,000 was acknowledged as paid by the instrument and the balance was to be paid within one year. The $1,000 that was acknowledged as paid by the instrument had been previously invested in the business in 1937 and had been accumulated by (Mrs.) Louise K. Hartz from small savings through the years. Under the investment arrangement she was to receive 6 per cent per annum on her money. Each of the bills of sale, above mentioned, was signed by petitioner, and the other party to the instrument. The 20 per cent interest of Harriet L. Hartz was acquired through an assignment, *241 dated January 2, 1941, from her husband, L. B. Hartz. The recited value was $30,506.07. She gave petitioner in 1937 $400, to put into the business. The money had been inherited from her grandfather. That amount was not to draw interest. The 25 per cent interest of petitioner was the part that he had reserved for himself. Under date of March 14, 1942, petitioner filed with the collector of internal revenue at St. Paul, a gift tax return in which the above-mentioned assignments were reported as gifts from L. B. Hartz to the respective donees and the tax paid thereon as follows: March 14, 1942 - $100; April 20, 1942 - $977.36. Each of the assignments, above mentioned, contained the following phrase in the granting clause: "but excluding all real property owned by me [L. B. Hartz] whether or not such real property is used in said business, * * *." However, under the same date, January 2, 1941, petitioner signed two instruments captioned "DECLARATION OF OWNERSHIP OF PROPERTY BY L. B. HARTZ" wherein he claimed ownership to two separate properties and further that he was holding the property for the benefit of the alleged partnership. Attached to the above-described instruments were *242 other documents, signed by the five alleged partners in which they agreed that the title to the real property described in the foregoing declarations should remain in the name of L. B. Hartz. The "CERTIFICATE OF BUSINESS NAME" was not filed, by the partnership alleged to have been formed January 2, 1941, with the District Court of Pennington County, until July 17, 1943. The alleged partners' relationship to petitioner and the services rendered to L. B. Hartz Stores are as follows: (Miss) Louise K. Hartz was 52 years old at the date of the hearing. She was a graduate of Duluth Central High School and Duluth State Normal College, and had taught school for about 30 years in Duluth, retiring in 1944. She was a resident, at all times pertinent to this case, of Duluth, Minnesota. Her net worth in 1925 was about $5,000 and had increased to about $23,000 by January 2, 1941. These amounts do not take into consideration her interests in the business of L. B. Hartz Stores. Since January 2, 1941, she has been present at at least one store opening and has attended meetings of the partners and participated in them. At the time of trial she was helping at home and had been doing some work with *243 the Red Cross and the Light House for the Blind at Duluth. B. J. Hartz (referred to sometimes as Bernard J. Hartz) was 79 years old at the date of the hearing. He had retired about 1936 from his carpentering and jobbing business. He was a resident, at all times pertinent to this case, of Duluth, Minnesota. The net worth in 1925 was between $20,000 and $25,000 and was about the same January 2, 1941. He occasionally went out into the territory where the new stores were being set up and supervised the installation of fixtures. He cautioned petitioner about the hazard of building a large store building in Thief River Falls, either late in 1941 or early 1942, after the building was already in progress. He also went over building costs on that building with petitioner. He assisted in making contracts and actual sales of honey in the Duluth market. He also participated in the informal meetings of the alleged partners, from time to time. (Mrs.) Louis K. Hartz was 74 years old at the date of the hearing. She was a resident, at all times pertinent to this case, of Duluth, Minnesota. She was not directly involved in the conduct of the business other than her participation in the informal *244 meetings from time to time. Harriet L. Hartz and the petitioner at the time of the hearing had been married for about nine and a half years. She was a resident of Thief River Falls, Minnesota. She entertained many of the people who had business with the company, accompanied petitioner on visits to stores, at times assisted in opening new stores, made some suggestions as to personnel also as to the operation of the business, has done considerable testing of samples, at times has taken orders and relayed them to the proper offices in the warehouse, has assisted in giving out mail, invoices and such things, and has helped in taking of inventories and has attended meetings of the alleged partners. She never did any regular work or put in regular hours. None of the parties involved drew any salary or pay for services they rendered to the business. The gross sales and net income of the L. G. Hartz Stores, for the years indicated are as follows: Year
Gross Sales
Net Income
1935
$ 608,900.59
$ 7,695.49
1936
841,568.62
19,444.73
1937
977,168.98
18,036.99
1938
1,030,439.10
19,900.09
1939
1,284,955.40
24,437.05
1940
1,678,829.82
36,856.41
1941
2,298,563.04
69,906.20
*245 The net worth of the business at the close of the various years was as follows: 1937 - $87,236.99; 1938 - $105,140.69; 1939 - $126,590.56; 1940 - $152,530.29; 1941 - $234,019.52; 1942 - $269,718.20. During the early days of the business, 1928 and 1929, when it was operating as a corporation, good will was carried on the books at $25,000. Good will has not been carried on the books of the business since 1932. Good will value was lost prior to the end of 1932, but by the close of 1936, its value had reached $25,000. By December 31, 1940, the good will had a value of between $40,000 and $45,000. There was a need of additional capital during the life of the business here under consideration. The operators of the business, whether it was under the corporation, individual enterprise or the alleged partnership, borrowed from many banks and different individuals in order to secure sufficient money to carry on the business. While the business was operating in the form of a corporation, the maximum amount of indebtedness or liability to which it could legally subject itself was $50,000, because of one of the articles of incorporation. After the formation of the alleged partnership, L. *246 B. Hartz Stores entered into a guaranty arrangement for loans, which was signed by the five members of the alleged partnership, with the Midland National Bank & Trust Co. of Minneapolis. The first guaranty was dated December 26, 1941, for $50,000. Another was dated June 12, 1942, for $100,000 and a third was signed December 3, 1942, for $125,000. The signatures on these instruments appear as of individuals and not partners. On August 18, 1942, the Administrator of the Wage and Hour Division, United States Department of Labor, filed a complaint in the District Court of the United States for the District of Minnesota, Sixth Division, against L. B. Hartz, Harriet L. Hartz, L. K. Hartz, B. J. Hartz, and Mrs. B. J. Hartz, individually and as co-partners, doing business as L. B. Hartz Stores and L. B. Hartz Stores, Inc., and L. B. Hartz Stores, a corporation, for violating certain provisions of the statutes concerning wages and hours. Judgment in the case was entered by agreement. It does not contain any determination that there was partnership, nor refer to partnership other than in the caption. On February 19, 1943, an action was begun in the United States District Court, District *247 of Minnesota, Sixth Division, by the Administrator, Office of Price Administration, against L. B. Hartz, Mrs. L. B. Hartz, B. J. Hartz, Mrs. B. J. Hartz, and Louise K. Hartz, a partnership, and L. B. Hartz Stores, and Emil Halderson for violating the meat restriction order No. 1. On October 21, 1943, the case was dismissed without prejudice or without cost to either party. Widespread publicity was given to both of the cases. The press release sent out by the United States Department of Labor, Wage and Hour Division, named the five members of the alleged partnership and stated that they were doing business as L. B. Hartz Stores and L. B. Hartz Stores, Inc. The total withdrawals of the alleged partners, for the years indicated, are as follows: Name
1941
1942
1943
1944
1945
L. B. Hartz
$2,995.06
$13,559.88
$10,494.59
$8,093.85
$5,927.12
Miss Louise K. Hartz
6,179.83
7,345.16
9,873.43
6,088.78
Bernard J. Hartz
2,170.15
3,186.40
4,175.58
2,763.85
Mrs. Louise K. Hartz
2,116.01
3,232.62
4,143.60
2,732.08
Harriet L. Hartz
3,940.10
5,156.08
5,896.91
5,711.20
The withdrawals by the alleged partners after deducting income *248 taxes, insurance premiums and donations made through the business, are as follows: * 1941
* 1942
1943
1944
1945
L. B. Hartz
$1,813.49
$1,886.85
$1,932.83
Miss Louise K. Hartz
None
750.00
1,800.00
Bernard J. Hartz
None
250.00
600.00
Mrs. Louise K. Hartz
None
250.00
600.00
Harriet L. Hartz
None
None
177.50
Opinion Petitioner argues that in two prior proceedings brought by the United States of America through its officers and agents, the United States District Court has found that L. B. Hartz, Mrs. L. B. (Harriet L.) Hartz, B. J. Hartz, Mrs. B. J. (Louise K.) Hartz, and (Miss) Louise K. Hartz were bona fide partners doing business under the firm name and style of L. B. Hartz Stores. Further that the decisions in each of these cases are determinative and binding in this proceeding under the doctrine of res judicata. "Briefly stated, the doctrine of res judicata is that an existing final judgment rendered upon the merits, * * * by a court of competent jurisdiction, is conclusive of rights, questions, and facts in issue, as to the parties and their privies, *249 in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." (30 Am. Jur. 908.) The question in the instant case is whether or not there was a partnership, for tax purposes, for the year 1941. The two cases above referred to were brought in 1942 and 1943. In neither of the cases were there any allegations as to when the alleged partnership began. Though in both consideration is given to the operation of the business at dates earlier than 1941, no reference is made as to what the business arrangement was at the earlier dates. Furthermore, it appears that the real question in the cases was not whether or not there was a partnership, but rather whether or not the organization of L. B. Hartz Stores was liable under the Wage-Hour statutes or under the OPA statutes. Concerning the query as to whether either case carries final adjudication of the partnership question, it is noted that in the Wage-Hour case (filed in 1942) the style of the case, as to the defendants, was as follows: "L. B. Hartz, Harriet L. Hartz, L. K. Hartz, B. J. Hartz, and Mrs. B. J. Hartz, individually and as co-partners, doing business as L. B. Hartz Stores and L. B. Hartz Stores, Inc. *250 , and L. B. Hartz Stores, a corporation, Defendants." In the body of the complaint filed in the Wage-Hour case there was a reference to the defendant L. B. Hartz Stores as a corporation and the final judgment rendered by the court makes no mention of business arrangement of the L. B. Hartz Stores other than what appears in the style of the case, above mentioned. Under the circumstances it can not be said that there was an adjudication that there was a partnership. In the OPA case (filed in 1943) the style of the case does name the five individuals as a partnership, but it is noted that this case was not prosecuted to a final judgment, but rather was dismissed October 21, 1943. Under such facts, neither case qualifies as being basis of res judicata for the instant case, on the question of partnership for Federal income tax purposes. The judgment must be for the years in question or it is a different cause of action. . In the Wage-Hour case there was no judgment that there was ever a partnership. The OPA case did not reach final judgment. The press releases sent out by the Department of Labor stating that the members of the Hartz family *251 were doing partnership business is obviously of no effect here. The evidence upon which petitioner relies as sufficient to overcome the presumption of correctness attaching to respondent's determination and to establish that a partnership did, in fact, exist between himself, his wife, his father, mother and sister, is meager. It is argued that the facts thus established are sufficient to prove that there was a valid partnership between the parties because: First, capital is an important factor in the business and each partner contributed to the business, capital which originated from outside sources. Second, each partner participated in the business and in its management and control. Third, all the partners intended to and did carry on the business as a partnership. We agree with petitioner that capital is an important factor in the business and that each alleged partner did contribute some capital to the business and that such capital did originate from outside sources. However, we do not agree that his acceptance of the money in the early days of the business from the alleged members of the partnership gave them an interest in the business from that early date. The money referred *252 to was investments made by the father and sister as early as 1925, and by the mother in 1937. (Some $400 invested by the wife in 1937 is not considered, since there was no showing or argument that it was to draw interest or that it was connected in any way with the formation of the alleged partnership.) On this point, petitioner argues as follows: Except in the case of the investment of Harriet L. Hartz, each investment made by the partners was with the understanding and agreement that interest of six per cent was to be paid, and the investor was to proportionately share in the current and future earnings of the business. There was a showing that the investors did receive 6 per cent interest on their money, but there was no showing that they shared in the current or future earnings of the business. Furthermore, there was no showing that the other members of the family, other than petitioner, took an active interest in the management in the early days of the business. There was positive testimony to the effect that petitioner repeatedly claimed the business as his own. This is especially true of the time between the dissolution of the corporation in 1937 and the formation of the *253 alleged partnership in 1941. This is further substantiated in the fact that the assignments of interest to the different members of the family were made by petitioner himself, with payments to be made to him, and the instruments indicate that he was the sole owner of the entire business. Also, it is noted that for this period petitioner reported the earnings of the business on his income tax return or on joint returns with his wife. Under the circumstances, petitioner's explanation of these points, appears inadequate. We, therefore, hold that there was no limited partnership arrangement between the period 1925 and 1941. Concerning petitioner's second point, the participation of each of the alleged partners in the management and control of the business, petitioner says in his brief: * * * Except for L. B. Hartz, none of them [referring to the other members of the alleged partnership] devoted full time to the business. The services which they thus performed standing alone might not be sufficient to qualify them as partners under the test of the Tower case, (supra), * * *. This appears to be an admission that the services performed are not sufficient to qualify the other members *254 of the family, other than petitioner, as a partner from the services standpoint, under the doctrine of . Moreover, in our opinion, the services performed by the members of the family, other than petitioner, are not sufficient to justify holding them to be partners on that ground. If any of the alleged members of the partnership could so qualify, it would be the wife, since she did testify that her activity in regard to the business did consume some of her time. However, the following testimony appears in the record, on cross-examination of Harriet L. Hartz (wife of petitioner): Q. Were your actions before January 2, 1941, any different than your actions after January 2, 1941? [This actual phrasing of the question is interpreted from the discussion preceding the answer.] A. I understand. I can't say that my actions were very much different because I probably did the same things before. I think I took more of an interest in the business after January 2, 1941. Q. You probably did the things most husband's wives would do in connection with their husband's activities. A. Probably. From this we conclude that her activities, from *255 a business standpoint, are not sufficient to justify us holding her a partner based on services contributed to the business. Her activities come no closer to qualifying as such than did the wife in the case of , where we held no partnership from the services standpoint. Petitioner's third point is that all the partners intended to and did carry on the business as a partnership. His argument here starts with his contention that there was a limited partnership started as early as 1925. We have already passed on and disagreed with that contention. As for the time between the dissolution of the corporation in 1937 and the formation of the alleged partnership on January 2, 1941, we have found as a fact that the business was operated as an individual proprietorship by petitioner. The case before us presents a problem similar to the one considered in the case of . There, as here, the alleged partners contributed some capital that originated with themselves. There, as here, there was some semblance of a partnership formed, and in both cases their efforts were made known generally. In , *256 the Supreme Court stated: * * * A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their "agreement, considered as a whole, and by their conduct in execution of its provisions." ( ; Cox v. Hickman, 8 H. L. Cas., 268). We see no reason why this general rule should not apply in tax cases where the Government challenges the existence of a partnership for tax purposes. * * * We are not convinced that there was a sufficient showing to justify us holding a partnership on the basis of services rendered, but we do feel that there was a joining together of some money for the purpose *257 of carrying on a trade, as was intended in the Tower case, just cited. However, we are also convinced that there was not a joining together of this money for the purpose of carrying on a trade until January 2, 1941. At that time the net worth of the business was $152,530.29. Under the Tower case, the only amounts that can be given credit for as invested capital is money contributed by and originating with the individual. Hence, the amounts named in the assignments dated January 2, 1941, can not be considered as invested capital, even though petitioner said that he did not consider them as gifts (except probably that of his wife). Under the circumstances, and in view of the evidence, we consider the amounts named in the assignments as gifts. The only amounts that we can say were invested in the business in 1941 were the amounts indicated in the bills of sale and only to the extent already in the business at the dates of the bills of sale. Each of the bills of sale stated that each of the alleged partners was to pay an additional amount, other than the amount that he or she had already invested, for the particular interest indicated in said bill of sale. In the case of Mrs. Louise *258 K. Hartz, she owed an additional $143.47 on her alleged.075 per cent interest in the business and the amount was to be paid within one year, with no indication that any interest was to be charged. There is no indication, either in the facts or on brief, that this amount was ever paid or that any attempt was ever made to collect it. In the case of B. J. Hartz, he owed an additional $1,750.60 on his alleged 2 per cent interest and the amount was to be paid within one year, with no indication that any interest was to be charged. He put into the business $300 in 1941 and $1,000 in 1942. This would indicate that there would still be due $450.60, with no indication that any attempt has been made to collect it. The sister, Miss Louise K. Hartz, owed an additional $16,379.54 on her alleged 15 per cent, represented by the bill of sale, and the amount was to be paid $1,500 per year, commencing July 1, 1942, with interest on the unpaid balance at 3 per cent per annum. She has since paid $9,000 into the business, but whether we can consider the debt to the petitioner and such payment into the business, sufficient to create an interest in the business in 1941, is another question. Under like instruments *259 to the father and mother, nothing indicates that the debts mentioned have been pressed for collection. Though $9,000 has been paid (at dates not shown), it was to the business, not to the petitioner, payee under the bill of sale, which fact plainly raises question as to the regularity of purchase of an interest from the petitioner, and as to the meaning of the arrangement to pay. Moreover, the sister's share of the net income of the business for 1941 alone is $17,476.55, almost twice as much as the $9,000 paid in altogether since the bill of sale of January 2, 1941. Though the record does not disclose later net income, since net worth of the business was greater in 1942 than in 1941 we may not assume that the net income from the business was less in the latter year. The sister's withdrawals are not controlling. She had the right to withdraw her net income. Nor is it important that for 1943, 1944, and 1945, her drawings, after deduction for income taxes, insurance premiums and donations made through the business, were comparatively small - approximating a total of $5,600. The fact remains that the business produced for her far more than the amount she agreed to pay for the bill of sale *260 (above the $6,500 lent her brother in earlier years). The gross sales, net income, and net worth of the business had shown a strong growth since 1935, all increasing steadily from, and including, 1937. We have not considered agreements to repay capital from partnership earnings as demonstrating real capital contributions. ; . Under the circumstances here, including the family relationship, the petitioner's apparent failure to collect amounts agreed to be paid by his mother and father, the fact that 25 per cent (the share claimed for the sister under the arrangement in January 1941), of the net income of the business for 1940 would be about $9,200, more than she has since paid in and a goodly percentage of her promise to pay, also the clear prospect of net income greater than promise to pay, we are of the opinion that we should not distinguish the situation here from those of promise to pay capital contributions from profits. Another point to be considered as to the reality of the alleged partnership, is the importance of the alleged partnership meetings. At no place in the *261 testimony is there a direct reference to a "real" partnership meeting, that is, one in which the alleged partners really discuss and consider together the problems of the business and made decisions pertaining to them. Rather, from the testimony, it appears that at the meetings there were merely reports by the petitioner of what he had done and what he intended to do in the future with the business. As indicated before, we hold that this case will follow the opinion of the Claire L. Canfield case, supra, and that the language in that case is as equally applicable here, where it says: Certain basic concepts are to be borne in mind. These are: That taxation is an eminently practical matter; that income is normally taxable to him who earns it; and that agreements between members of an intimate family group are to be closely scrutinized and tested in the light of reality to the end that realism and not mere form shall fix tax consequences. Thus, in the present case, though the agreement of the parties may come within the scope of the statutory definition of partnerships, we find that it lacks the necessary reality to determine by its terms the taxability of income earned. It is our *262 opinion that the agreement resulted in a business arrangement in which the parties should be taxed in proportion to their respective contributions to capital and services. Since exact measurement of the amount of income attributable to either capital or services is impossible, a practical approach to the problem is required. * * * In working out the problem, we feel that petitioner should be allowed an amount for his services, since they are unquestionably worth a great deal to the business. Petitioner testified that they were worth about $500 a month. It appears reasonable that that amount should be allowed for his services rendered to the business. We therefore conclude and hold that the income of the business should, after an allowance for salary of the petitioner for management, be divided by him with the family only to the extent of the actual contributions by the members, prior to January 2, 1941, and on the basis of net worth of the business at that time; that is to say, after deduction of $500 a month, the remaining portion of the profits of the alleged partnership for 1941 should be divided as follows: Miss Louise K. Hartz - 6,500/152,530.29; B. J. Hartz - 1,300/152,530.29; *263 Mrs. Louise K. Hartz - 1,000/152,530.29; Harriet L. Hartz - none; and that petitioner is taxable on the remaining 143,730.29/152,530.29. We have not considered the good will of the business in making the above allocation, since there was a constant need of additional capital, which may reasonably be considered as one of the reasons petitioner took his family into his business, they then being used as guarantors. Decision will be entered under Rule 50. Footnotes
*. No breakdown available for these two years.↩